## MILLIORN *v.* CLOW.

[70 Pac. 398.]

WAREHOUSEMEN—POSSESSION OF PROPERTY PLEDGED.

1. It is essential to the validity of a receipt issued by a warehouseman as a pledge for his own debt, as against subsequent *bona fide* purchasers, that the property pledged shall be really on hand in the warehouse, and that there shall be an actual or symbolical delivery thereof.

PRESUMPTION OF FAIR DEALING—REBUTTING EVIDENCE.

2. The presumption of regularity and fair dealing in private transactions, created by Hill's Ann. Laws, § 776, subds. 1, 19, 20, and 34, is overcome, in the case of a warehouseman who has issued receipts for property as collateral security for his own debts, by evidence that on closing the business there was not enough of that kind of property to satisfy the receipts held by actual depositors, and a lack of evidence that the warehouseman had owned any property in the warehouse when he gave the collateral receipts.

APPEAL—PREJUDICIAL RULING.

3. No appeal can be prosecuted from a ruling not prejudicial to the appellant, as witness this case: A warehouseman died leaving outstanding receipts for more than 12,000 bushels of wheat, with only 10,114 bushels on hand, and two receipts for 2,500 bushels given as collateral to his notes, and not representing wheat actually received from the note creditor, or wheat of the warehouseman's on hand. A receiver was necessary to care for the warehouse and its contents pending litigation over the conflicting rights. The decree, after paying the receiver, divided the proceeds in certain proportions among the actual depositors, excluding the holder of the collateral receipts. Clearly, the latter could not complain of the terms of the distribution, for there was not enough wheat to pay even the actual depositors, and before he could receive anything the receiver's charges were properly payable besides.

From Lane: JAMES W. HAMILTON, Judge.

This is a suit by H. M. Milliorn and thirty-seven other depositors of wheat in a warehouse at Junction City, Oregon, operated by Robert Clow, now deceased, against Caroline Clow, as administratrix of his estate, and fifteen others, to secure a *pro rata* distribution of a fund arising from the sale of certain wheat, and to compel the defendants Balfour, Guthrie & Co. to pay the value of certain other wheat received by them. The transcript shows that for several years prior to January 7, 1900, Robert Clow stored his wheat in said warehouse, and also that which was deposited by others, issuing to them warehouse receipts. He also operated at that place a flouring mill, grinding his own wheat, and also that stored in his warehouse for the express purpose of being manufactured into flour; issuing to such depositors exchange receipts, stipulating to deliver to them a given quantity of flour for each bushel of wheat. The defendant H. M. Grant on September 18, 1899, loaned Clow $1,000, and on the 27th of that month also loaned him a like sum, taking his promissory notes therefor, payable in eighty-seven days and three months respectively, with interest at 10 per cent per annum; and, as security therefor, Clow issued to him on September 21st and 27th two warehouse receipts, each to the effect that he had received from him 2,500 bushels of merchantable wheat, to be delivered on board the cars, sacked and in good order, upon the return of the receipts and the payment of certain storage charges. The defendants Balfour, Guthrie & Co. on October 2, 1899, purchased from Clow 5,000 bushels of wheat, paying therefor the sum of $2,950; and thereafter, but prior to November 8, 1899, they received from him a further shipment of 6,167 bushels and 18 pounds, on account of which they advanced to him the sum of $3,268.43. Clow died intestate January 7, 1900, and his widow, the defendant Caroline Clow, was appointed and duly qualified as administratrix of his estate. The plaintiffs, believing that said warehouse did not contain the amount of wheat specified in their several receipts, instituted this suit, alleging the quantity stored by each, and also giving the names of ninety-four others who had deposited wheat to be exchanged for flour, and stating

the quantity stored by each of the latter, none of whom were made parties. A receiver was thereupon appointed, who found in the warehouse 9,114 bushels and 20 pounds of wheat, and in the mill a quantity of flour and bran equivalent to 1,000 bushels of wheat, all of which was sold by order of the court, and the money derived therefrom deposited with the clerk. Grant, not having received any payment on said promissory notes, or any of the wheat specified in his receipts, filed a cross-bill, in which he sought to join interests with the plaintiffs, and to recover from Balfour, Guthrie & Co. a *pro rata* share of the deficiency. The court, upon trial of the cause, found from the testimony that plaintiffs had stored in said warehouse 9,964 bushels and 18 pounds of wheat, and that the other persons specified in the complaint, but not made parties to this suit, had deposited therein 2,604 bushels and 53 pounds, for which they were to receive flour; that Grant never had any lien on the wheat in said warehouse, and was not entitled to recover any sum from the defendants Balfour, Guthrie & Co.,—and decreed, by stipulation of plaintiffs' counsel, but over Grant's objection, that the depositors of wheat to be exchanged for flour should share equally with plaintiffs in the *pro rata* distribution of the fund, and, having dismissed the suit as to Balfour, Guthrie & Co., allowed plaintiffs their costs against the defendant Caroline Clow, and deducted $350 from said fund for the receiver and his attorney. The defendant Grant appeals.                                            AFFIRMED.

For appellant there was a brief over the names of *Snow & McCamant* and *W. C. Hale,* with an oral argument by *Mr. Zera Snow* and *Mr. Hale.*

For respondents, plaintiffs, there was a brief and an oral argument by *Mr. A. C. Woodcock.*

For respondents, Balfour, Guthrie & Co., there was a brief and an oral argument by *Mr. Francis D. Chamberlain.*

MR. CHIEF JUSTICE MOORE, after stating the facts, delivered the opinion of the court.

It is contended by appellant's counsel that Clow, after having issued the warehouse receipts to their client, shipped wheat to Balfour, Guthrie & Co. to which he was entitled, and, this being so, the court erred in not decreeing against them, in Grant's favor, a recovery of a *pro rata* share of the deficiency caused by their conversion of the wheat. It is insisted by counsel for Balfour, Guthrie & Co., however, that, if Clow owned any wheat in the warehouse, his attempt to hypothecate it to Grant as security for the money loaned was in effect a chattel mortgage, and, not having been filed or recorded, as required by law, was void as to their clients, and that, no testimony having been offered to show that Clow owned any of the wheat stored in his warehouse, no property was ever appropriated to the receipts issued to Grant, and therefore no error was committed as alleged. It was averred, in substance, in Grant's cross-complaint, that, at the time his warehouse receipts were issued, Clow was the owner of, and had in store in his warehouse, large quantities of wheat of the crop of 1899, and more than sufficient to supply the demands of all depositors, and also to furnish the quantity called for in the receipts so issued to him, and that at the time the crop of that year began to be deposited there was no wheat on storage in said warehouse.

It is impossible to determine with any degree of certainty what quantity of wheat was in the warehouse when the crop of 1899 began to be stored therein. The defendant B. S. Harris, a miller employed by Clow, testifies as a witness in his own behalf that, in his opinion, there were on store in the warehouse at that time 1,000 bushels. But J. M. Hays, who was employed in the mill, says, however, that there were not more than two or three hundred bushels. This witness also says that, after he had examined and estimated the quantity of wheat stored in the bins, the mill was run a day or two, grinding about 100 bushels a day, before the crop of 1899 began to be stored in the warehouse. The defendant J. H. Akers sought to participate in the distribution of the fund in court, based upon a warehouse receipt issued by Clow to him for 131 bushels of 1898 wheat; but, as he was denied any relief, the

court must necessarily have found that the wheat stored in that year was all withdrawn before the crop of the next year began to be deposited in the warehouse, and in this implied finding we concur.

There is no testimony tending to show that at the time Clow delivered the receipts to Grant he had any wheat of his own in the warehouse, nor does it appear that any wheat belonging to him was thereafter placed therein, unless such fact may be inferred from the shipments made by him to defendants Balfour, Guthrie & Co. Grant, as a witness in his own behalf, testifies that he examined the stubs of Clow's check book after he loaned him the first $1,000, and found that within three days therefrom Clow had purchased wheat, drawing checks on the bank in payment therefor, as follows: Peter Harpole, $90; Ed Bailey, $450; Thomas Bailey, $72; W. B. Milliorn, $38; and Jesse Soverns, $350,—thus accounting for the sum of money first loaned Clow. A similar statement is made by witness with respect to the second loan. If it be admitted that this testimony was competent to establish purchases of wheat with the money loaned by Grant, there is no testimony tending to show that any of this wheat was ever deposited in the warehouse. The money paid and advanced by Balfour, Guthrie & Co. to Clow was evidenced in part by thirty-five sight drafts drawn by him upon them in favor of various persons, amounting to $6,578.43. J. T. Clow, a son of Robert, who was employed by his father in the warehouse and mill, being called as a witness for the defendants Balfour, Guthrie & Co., in speaking of these sight drafts, says that the sum of $5,972.63 was paid for wheat.

1. Though a warehouseman, in the absence of a statute to the contrary, may issue a warehouse receipt for his own goods in store, by way of sale, and confer an indefeasible title, yet, when he issues such receipt by way of pledge to secure his own debt, it is generally held that such a pledge is not good, as against subsequent *bona fide* purchasers of the goods, unless there has been an actual or symbolical delivery thereof: 28 Am. & Eng. Enc. Law (1 ed.), 682; Colebrooke, Col. Sec.

(2 ed.) § 420. In *Cochran* v. *Ripy,* 13 Bush, 495, it was held that the right to pledge goods as security for the payment of a debt was derived from the common law, and existed independently of the statute; that a warehouseman might give receipts for his own goods stored in his own warehouse as security for the payment of a debt, the execution of the receipt being a symbolical delivery of the property, which transferred the right of possession, as between the parties, as effectually as an absolute purchase, but that, to give the transaction such validity, the warehouseman, at the time he issues the receipt, must be in possession of the goods so stored in the warehouse kept by him and under his control. "It," says Mr. Justice CLOPTON in *Alabama State Bank* v. *Barnes,* 82 Ala. 607 (2 South. 349), "may be regarded as now settled that a warehouseman, having property of his own stored in his warehouse, may, in the absence of statutory enactments, issue receipts therefor, and pledge the property as collateral security for his own debt by delivery of such receipts."

In *National Exch. Bank* v. *Wilder,* 34 Minn 149 (24 N. W. 699), it was held that the owner of goods, if a warehouseman, might pledge the same by delivering to the pledgee his own warehouse receipt, the issuance of which was sufficient to put the pledgee in constructive possession and control of the property. Mr. Justice MITCHELL, speaking for the court in rendering the decision, says: "In this case, as appears from the findings of the court, there was an appropriation of specific property to the contract, and the elevator company was a warehouseman, and hence could create a valid pledge by issuing its own warehouse receipts." Further in the opinion it is said: "But inasmuch as the issuing of warehouse receipts by a warehouseman for his own grain actually in store transfers the title and legal possession to the holder of the receipts, and makes the warehouseman his bailee, we think such holder should be deemed a depositor, within the meaning of the act, the same as if he had made an actual physical deposit of the grain. In other words, the statute should be construed so as to embrace and include as depositors all who own or hold grain actually in

store, whether deposited by themselves or by others to whose rights they have succeeded.'' In *Eggers* v. *National Bank of Com.* 40 Minn. 182 (41 N. W. 791), it was held that no distinction existed between the person who delivered his grain at a public warehouse and a pledgee of the grain of a warehouseman actually upon deposit therein, who leaves it in store with the proprietor as his bailee, taking a warehouse receipt therefor. In *Fishback* v. *Van Dusen*, 33 Minn. 111 (22 N. W. 244), it was held that, to constitute an executed contract of pledge of goods, some specific property must be appropriated to the contract; the court saying: ''It is an elementary principle of law, applicable alike to sales, mortgages, and pledges, that the contract becomes executed only by specifying the goods to which it is to attach, or, in legal phrase, by the appropriation of any specific goods to the contract. Until this is done the contract is executory, and the property does not pass. There was no such appropriation of any specific grain to these contracts, even under what may be termed the modern American doctrine,— that where the mass from which the sale, mortgage, or pledge is made is uniform in character and quality, as wheat in an elevator, separation from the mass is not necessary to constitute an appropriation of the property to the contract. But in this case, out of what mass was this wheat to be taken? There is no evidence that there was any wheat in the mill when these receipts were executed, and, if there was, there is nothing to show that it was the wheat referred to. So far as appears, the banks might, with equal propriety, claim any other wheat situated elsewhere.'' In the cases to which attention has been called, the validity of the receipts issued by a warehouseman for his own goods as a pledge for the payment of his debt was made to depend upon the fact that such goods were actually stored in his warehouse at the time the receipt was executed, so that the goods were thus appropriated as the subject-matter of the contract, and a symbolical delivery of the right of possession thereof passed to the pledgee by the execution of the receipt.

2. In the case at bar no testimony was offered tending to

show that Clow, at the time he issued his receipts to Grant, owned a bushel of the wheat stored in his warehouse. Grant, as a witness in his own behalf, testifies that at the time he loaned the money to Clow he visited said warehouse, and found large quantities of wheat therein; and his counsel, invoking the presumptions that a person is innocent of wrong, that private transactions have been fair and regular, that the ordinary course of business has been followed and that the law has been obeyed (Hill's Ann. Laws, § 776, subds. 1, 19, 20, 34), contend that this evidence was sufficient to show Clow's ownership of the wheat pledged to their client. The statute regulating warehousemen, so far as deemed material herein, is as follows: "It shall be the duty of every person keeping * * any warehouse * * where grain * * is stored, to deliver to the owner of such grain * * a warehouse receipt therefor": Hill's Ann. Laws, § 4201. "No person shall issue any receipt * * for any grain * * not actually in store at the time of issuing such receipt": Hill's Ann. Laws, § 4202. "No person operating any warehouse * * shall sell, encumber, ship, transfer or in any manner remove * * any grain * * for which a receipt has been given by him * * without the written assent of the holder of the receipt": Hill's Ann. Laws, § 4204. "Any person who shall violate any of the provisions of this act shall be liable to an indictment and upon conviction shall be fined," etc.: Hill's Ann. Laws, § 4207. The testimony conclusively establishes the fact that there was a deficiency in the quantity of wheat that had been stored, and should have been on deposit in the warehouse at the time of Clow's death; thus showing that the provisions of the statute adverted to had been violated. This fact, upon principle, in our opinion, rebutted the presumption invoked, and imposed upon Grant the burden of showing that Clow owned the quantity of wheat pledged to him; but, having neglected or being unable to do so, he failed to establish one of the material allegations of his cross-complaint.

3. The court, in pursuance of the stipulation of plaintiff's counsel, but over Grant's objection, permitted the holders of

warehouse receipts evidencing 2,604 bushels and 53 pounds, for which an equivalent in flour was to be given, to participate in the *pro rata* distribution of the fund in court. It will be remembered that the court found that plaintiffs were entitled to 9,964 bushels and 18 pounds of wheat, and that there were, including the flour and bran as equivalent to wheat stored in the warehouse and in the mill, only 10,114 bushels and 20 pounds, so that after plaintiff's claims were supplied there would remain only 150 bushels and 2 pounds; and, as the receiver was entitled to some compensation that must have been paid out of the fund, Grant was not prejudiced by the decree complained of, which is affirmed.          AFFIRMED.